Filed 1/12/23  In re D.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re D.R. et al., Persons Coming Under the Juvenile Court Law. | C095747 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, | (Super. Ct. No. STK-JV-DP-2019-0000245) |
| Plaintiff and Respondent, | |
| v. | |
| F.R. et al., | |
| Defendants and Appellants. | |

Appellants Da.R. (mother) and F.R. (father), the parents (collectively, parents) of the minors A.P. and D.R. (collectively, the minors), appeal from the juvenile court's orders terminating their parental rights and ordering the minors be placed for adoption. (Welf. & Inst. Code, §§ 366.26, 395).[1]  Parents contend that the juvenile court erred by

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

(1) denying mother's request for a bonding study; (2) finding the beneficial parental relationship exception did not apply to prevent the termination of parental rights; and (3) finding the sibling relationship exception did not apply to prevent the termination of parental rights. Parents also claim the San Joaquin County Human Services Agency (Agency) and the juvenile court failed to comply with the inquiry requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.), because the Agency did not contact extended family members to inquire about the ICWA and the juvenile court made no findings regarding agency compliance in that regard.

We will conditionally affirm subject to full compliance with the ICWA on remand, as described in this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### I

### *Initial Dependency Proceedings*

On June 18, 2019, the Agency filed a petition alleging that A.P. (then age three years) and D.R. (then age two years), came within the provision of section 300, subdivision (b)(1), failure to protect, and section 300, subdivision (g), no provision for support. The petition alleged that the minors were placed in protective custody following multiple contacts regarding unsafe and unsanitary living conditions and neglect. The home was filthy, the minors' bedroom was covered in feces, and the minors' maternal half sibling, L.S., came to school dirty and smelling of dried urine.

At the initial detention hearing on June 19, 2019, the juvenile court declared D.D. the alleged father of A.P. and father the presumed father of D.R. On July 9, 2019, the Agency filed an amended section 300 petition to reflect mother's 2007 diagnosis for bipolar disorder, with intermittent explosive disorder, for which she was not medication compliant. The amended petition also included mother's disclosure that she suffered from undiagnosed anxiety and father's disclosure that he suffered from diagnosed but untreated anxiety. D.D. subsequently appeared and was declared the biological father of

A.P, and father was found the presumed father of A.P. D.D., mother, and father each completed an ICWA-20 form denying any Native American ancestry.

The juvenile court took jurisdiction over the minors after parents submitted on the amended petition.

## II

### *Disposition*

The Agency's December 23, 2019, disposition report showed that mother, father, and D.D. all reported having no Native American ancestry, and as a result, the Agency reported that there was no reason to believe the minors were Indian children under the ICWA. The report showed that both minors were diagnosed with autism, placed with the maternal grandparents, and had visits three times a week with parents. The case plans consisted of obtaining suitable housing, psychological care, counseling, and parenting education.

On January 6, 2020, the juvenile court held the dispositional hearing and made the orders and findings from the Agency's disposition report. The juvenile court ordered reunification services as to mother and father but not D.D.

## III

### *Status Review*

On May 20, 2020, the Agency filed a section 388 request to change the juvenile court's order of reunification services to mother. The Agency's motion sought to bypass reunification services to mother under section 361.5, subdivision (b)(2), based on mother's two psychological evaluations. During an evaluation with Dr. Sidney Nelson, mother was uncooperative, did not see need for improvement, and did not believe that the chronic smearing of feces posed a health hazard. Following evaluation, Dr. Gary Cavanaugh diagnosed mother with a "personality disorder with narcissistic, passive aggressive and oppositional-defiant traits and anxiety symptoms associated with her disorder of personality." Dr. Cavanaugh opined mother would not benefit from

3

reunification services. The Agency subsequently withdrew the section 388 request and at the November 30, 2020, dependent review hearing, the juvenile court ordered further reunification services for mother.

The Agency's December 9, 2020 status review report showed the results of mother's October 2, 2020, psychological evaluation with Dr. Cavanaugh, who noted that mother showed improvement in behavior, focus, and acceptance of responsibility. He indicated that mother was diagnosed with: adult autism provisional diagnosis, personality disorder unspecified, anxiety disorder unspecified, and attention deficit hyperactive disorder inattentive type provisional diagnosis. He opined that with the current programming for mother, she could reunify with the minors within a year. It was reported that father had also made progress with services. Based on the substantial progress, the Agency recommended continuing reunification services to both mother and father beyond 18 months due to extraordinary circumstances.

At the December 10, 2020 dependent review hearing, the juvenile court found extraordinary circumstances existed and continued the matter for 90 days.

The Agency's April 6, 2021 supplemental status review report showed that parents resided in a motel room and that mother gave birth to twins on September 17, 2020, who also resided in the room. A.P. and D.R. continued to thrive in placement and no longer met the medical necessity for services as their behavior issues had ceased. The Agency assessed the motel room and noted it was evident the room, which had a single bed, could not accommodate parents, the twins, and the minors Despite assistance, father had been unable to find employment, which affected parents' ability to obtain suitable housing. Parents demonstrated minimal effort to remain engaged in reunification services and had not obtained suitable housing or demonstrated an ability to do so. The Agency recommended terminating reunification services.

At the June 9, 2021 contested dependent review hearing, the Agency requested that services to parents be terminated because the case was at 24 months, and it was not

4

safe to return the minors to their care. The Agency emphasized that delays engaging in visitation, failure to participate in the minors' Individual Education Programs, and failure to obtain suitable housing were the biggest obstacles to progress in this dependency matter. The Agency stipulated to the progress made by parents in their case plans but contended parents did not follow through with the component of maintaining appropriate housing, father looking for a job, and mother applying for disability under Social Security.

The juvenile court found that housing was a primary issue and the small motel room was likely insufficient. The juvenile court acknowledged that obtaining housing had been a challenge but stated that it had been two years with every possible extension from the juvenile court to give parents an opportunity to obtain housing. The juvenile court terminated reunification services and set a selection and implementation hearing pursuant to section 366.26 but advised parents that they still had time before the hearing to obtain adequate housing.

IV

*Section 366.26 Hearing*

The Agency filed a September 28, 2021 status review report and an October 25, 2021 section 366.26 report in advance of the section 366.26 hearing. The Agency reported there was no reason to believe the minors were Indian children within the meaning of the ICWA, detailed the prior inquiries and the responses from parents, and requested a finding that the ICWA did not apply. It was reported that D.R. had no problem visiting with parents, but A.P. had "expressed on numerous occasions" that she did not want to visit them. Following one recent visit, A.P. was distraught because her parents told her she would move in with them, and she woke up screaming three times during the night. Both minors stated that they wished to continue to reside with their caregivers, the maternal grandparents. It was also reported that the caregivers remained committed to adopting the minors, who had been in their care since August 2019. The

5

Agency's recommendation for both minors was termination of mother's and father's parental rights with a permanent plan of adoption.

Mother and father each requested a bonding study, arguing that the minors were bonded with them, the twin siblings, and the oldest sibling, L.S., who resided with her biological father. The Agency opposed, noting both A.P. and D.R. reported to the social worker that they "like staying with the caregiver and want to live there forever." The juvenile court denied the bonding study requests, explaining that it was not necessary "at this late date" and the parties could demonstrate a bond, or lack thereof, through other evidence.

At the contested section 366.26 hearing, which began on December 13, 2021, and was held over multiple days, the juvenile court heard extensive testimony from parents, the social worker, L.S., the maternal grandfather, and other witnesses. L.S. testified that on occasions when she visited parents with the minors, the visits were positive, and it seemed like the minors wanted to stay longer. L.S.'s stepmother testified that the minors were usually excited to see L.S. during visits. The social worker testified that the minors told her they wanted to live with their grandparents on several different occasions. The social worker testified that the minors were autistic, required a set schedule, and did not handle transitions well; the minors were very attached to their grandparents.

The maternal grandfather testified that D.R. became more anxious when it was time to visit parents and her behavior was somewhat worse after returning. He testified that A.P. was more nervous before visits with parents, and she stated that she did not want to go before nearly every visit. She was also more emotional and clingier after returning from visits. The minors did not ever ask to spend more time with parents or their other siblings. The maternal grandfather also testified that the minors enjoy seeing L.S. but do not talk about her when she is not around. Because L.S. is their grandchild as well, there were some visits the grandparents arranged with the minors and L.S. The maternal grandmother testified that after parents told the minors they were getting a new

6

house and the minors would live with them, A.P. became upset and did not want to move or return to visit parents.

Father and mother each testified that the minors enjoyed spending time with their siblings. Father testified that he told L.S. that her testimony could assist them in the dependency case, and he would sometimes tell D.R. that returning her to the maternal grandparents' home was not "our choice." Mother testified to her belief that she had an "extremely close" bond with the minors.

The parties stipulated that the minors loved and enjoyed time with parents and were also happy living with their grandparents. The juvenile court found that there was clear and convincing evidence that it was likely the minors would be adopted, none of the exceptions pursuant to section 366.26, subdivision (c)(1) existed, termination of parental rights would not be detrimental to the minors, and it was in the best interest of the minors to terminate parental rights. As to the parent-child exception, the juvenile court stated that parents regularly visited with the minors but also believed the maternal grandparents' testimony regarding the minors' behaviors before and after visits. As to the sibling bond, the juvenile court did not find the same strength and duration in the subject minors' relationship with the twins as compared to their relationship with L.S.. However, in rejecting the sibling bond exception, the court found gaps in the relationship between the minors and L.S., due to infrequent visitation. The juvenile court ultimately ordered parents' parental rights terminated and freed the minors for adoption.

Parents filed timely notices of appeal.

## DISCUSSION

### I

### *Bonding Study*

Parents contend the juvenile court abused its discretion in denying mother's request for a bonding study because an "expert opinion would be the best evidence" in

assessing the bond between the minors, their mother, and other siblings. We find no error.

Under Evidence Code section 730, a court *may* appoint an expert to study the bond between a parent and a child. (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.) "There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" terminating parental rights. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.) The juvenile court has broad discretion on whether to order a bonding study. (*Id.* at pp. 1339-1341.) On review, we determine "whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study." (*Id.* at p. 1341.)

"The kind of parent-child bond the court may rely on to avoid termination of parental rights . . . does not arise in the short period between the termination of services and the section 366.26 hearing." (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1196.) Because the quality of the parent-child bond required to avoid termination of parental rights must necessarily have developed over time and have resulted in a continuing, positive emotional attachment which should be apparent at the time of the section 366.26 hearing, belated studies occurring just prior to the hearing may not be particularly useful in establishing an exception to termination of parental rights. (*Richard C.*, at pp. 1196-1197.) Such is the case here. Without identifying any particular failings in the Agency's reports over the dependency period, mother argued an expert was needed just prior to the section 366.26 hearing to assess the minors' bond with her and the minors' siblings to determine if termination of parental rights was in the minors' best interest. To the contrary, the nature of the bond was apparent from the reports and visitation logs over the 30 months the minors were involved in the dependency process. The parties stipulated that the minors loved and enjoyed time with parents. Based on that record, the juvenile court was well aware of the nature of the bond between the minors and their mother and siblings.

Mother provides no justification for waiting until one week before the section 366.26 hearing—over three months after her reunification services were terminated—to file her request for a bonding study. This is of concern because "bonding studies after the termination of reunification services" already "frequently require delays in permanency planning." (*In re Richard C., supra*, 68 Cal.App.4th at p. 1197.) Here, there was no valid reason for mother to have waited over three months to make her request, which would then necessarily require a last minute and substantial continuance of the section 366.26 hearing. Parents have not shown that the juvenile court clearly abused its discretion. Absent such a showing, the juvenile court's exercise of discretion will not be overturned. (*In re Lorenzo C., supra*, 54 Cal.App.4th at p. 1341.)

II

*Beneficial Parental Relationship Exception*

Parents contend the juvenile court erred in failing to find the beneficial parental relationship exception to adoption applied based on their relationship with the minors. They argue that the juvenile court erred in its analysis under *In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*) because the evidence supported application of the exception. We disagree.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is the so-called beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *Caden C., supra*, 11 Cal.5th at p. 629.)

9

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*Caden C., supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) The parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, at p. 636.)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Caden C., supra*, 11 Cal.5th at pp. 639-640.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640-641.)

Here, the fact that parents consistently visited the minors was undisputed. As for the second and third elements, the juvenile court conducted a detailed analysis under *Caden C.* and concluded parents did not meet their burden to establish that termination of that attachment would be detrimental to the minors. After removal, the minors spent two and a half years with their grandparents, where they thrived, while the parents' contact with the minors was limited to visits. The juvenile court focused on evidence that before and after those visits, the minors had some anxiety and behavioral problems, and A.P. in

particular voiced that she did not want to leave her grandparents' home and sometimes resisted visits with parents. In light of the stability the minors enjoyed in their grandparents' home and the evidence that the minors both told the social worker they wished to stay with their grandparents, there was a dearth of evidence to demonstrate the minors would suffer detriment if parental rights were terminated. Having considered both the evidence and oral argument, and noting parents had the burden to show the exception applied, the juvenile court found there was insufficient evidence of detriment to the minors and thus the exception did not apply. We conclude the juvenile court's finding is well-supported by the record. There is no error.

III

*Sibling Relationship Exception*

Parents contend the juvenile court's failure to apply the sibling relationship exception to adoption was error. We disagree.

One circumstance permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child" is when termination of parental rights would result in "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) There is a "heavy burden" on the party opposing adoption under the sibling exception. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) "To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the

11

relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952, fn. omitted.) We do not substitute our judgment for that of the juvenile court. (*Caden C., supra*, 11 Cal.5th at p. 641.)

While by all accounts the minors enjoyed their visits with the twins and L.S., there is not sufficient evidence that the siblings' relationship was so significant that severance would have been detrimental to the minors. The minors never resided in the home with the twins, who were born sometime after the subject minors were removed from the home. The record shows visits between the minors and L.S. were limited over the course of the case because L.S.'s biological father had custody of L.S., and there were considerable gaps in the relationship. There was testimony that the minors did not ever ask to spend more time with their siblings or talk about L.S. when she was not with them. As the juvenile court noted, L.S. was no longer under the jurisdiction of the juvenile court and her biological father had custody. As the court further noted, the grandparents were also grandparents to L.S. and to the twin siblings, and L.S. had visited the grandparents' home and the grandparents wished to continue those visits. Parents bore the burden of demonstrating the sibling relationship exception to adoption applied and failed to make the requisite showing. (*In re Daniel H., supra*, 99 Cal.App.4th at p. 813.) The juvenile court did not err.

IV

*ICWA*

As a preliminary matter, parents contend the juvenile court failed to make ICWA findings, including finding the Agency satisfied its obligation to inquire. The Agency concedes the juvenile court failed to make the findings. A juvenile court must make findings as to the applicability of the ICWA and its failure to do so is error. (*In re Jennifer A.* (2002) 103 Cal.App.4th 692, 704-705, 709.) Here, the juvenile court made *no* findings as to the adequacy of the Agency's inquiry or whether the ICWA applied. This

12

was error. Parents further contend that the juvenile court's error in failing to make an ICWA finding is not harmless because the Agency and the juvenile court failed to comply with their duty of inquiry under section 224.2, subdivision (b). We agree.

As this court recently explained: " 'The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings. [Citations.] A major purpose of the ICWA is to protect "Indian children who are members of or are eligible for membership in an Indian tribe." [Citation.]' (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) The ICWA defines an ' "Indian child" ' as a child who 'is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.' (25 U.S.C. § 1903(4).) The juvenile court and the social services department have an affirmative and continuing duty, beginning at initial contact, to inquire whether a child who is subject to the proceedings is, or may be, an Indian child. (Cal. Rules of Court, rule 5.481(a); § 224.2, subd. (a).)" (*In re G.A.* (2022) 81 Cal.App.5th 355, 360, review granted Oct. 12, 2022, S276056.)

"[S]ection 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his [or her] family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian

13

child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.) We review claims of inadequate inquiry into a child's Native American ancestry for substantial evidence. (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430.)

Parents cite section 224.2, subdivision (b), which imposes a more extensive duty to inquire about Native American ancestry if a child is placed in the temporary custody of a welfare department (§ 306) or probation department (§ 307): "Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child . . . ." (§ 224.2, subd. (b).)

The Agency does not dispute parents' claim that it made no inquiry of any of the minors' extended family members, despite frequent contact with some of those relatives, including the maternal grandparents. The Agency concedes its inquiry extended no further than parents and D.D. and was inadequate under section 224.2, subdivision (b), but argues that any error is harmless because "the record contains [no] information suggesting a reason to believe that [the minors] may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 779, review granted Sept. 21, 2022, S275578; see *id*. at pp. 779-782.) Recently, our Supreme Court granted review in *Dezi C.*, and in *In re G.A.*, and we anticipate further clarification on this issue. Until such time, we conclude that given the Agency's concession and the remedial purpose underlying the ICWA and related California law intended to protect third party rights, we apply the analytical framework set forth by the California Supreme Court in *In re A.R.* for assessing harm and we conclude the error is prejudicial. (*In re A.R.* (2021) 11 Cal.5th 234, 252-254 [determining whether an error is prejudicial requires viewing the error through the lens of the remedial purpose of the law at issue].)

## DISPOSITION

The orders terminating parental rights are conditionally affirmed subject only to full compliance with the ICWA as described in this opinion.  If, on remand, the juvenile court determines the ICWA applies, the court shall vacate its previous orders terminating parental rights and conduct further proceedings consistent with the ICWA, including a new section 366.26 hearing.  (25 U.S.C. § 1914; § 224, subd. (e).)


                                            /s/
                                    EARL, J.



We concur:



        /s/
RENNER, Acting P. J.



        /s/
KRAUSE, J.


15